# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MATTHEW NOLAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 12 C 0247 |
| v. | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM, OPINION, AND ORDER

AMY J. ST. EVE, District Court Judge:

On June 16, 2014, Plaintiff Matthew Nolan ("Nolan") filed a First Amended Complaint against Defendant United States under the Federal Tort Claims Act ("FTCA") alleging a medical malpractice claim based on events occurring while he was detained by the Federal Bureau of Prisons at the Metropolitan Correctional Center ("MCC") in Chicago, Illinois. *See* 28 U.S.C. §§ 1346, 2671, *et seq*. On August 6, 2015, Defendant moved to exclude the expert testimony of Dr. Eric Ostrov regarding causation pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). For the following reasons, the Court, in its discretion, grants Defendant's *Daubert* motion to exclude Dr. Ostrov's expert testimony as to causation.

## BACKGROUND

### I. Factual and Procedural Background

The following background facts are based on the October 19, 2011, Memorandum, Opinion, and Order in Nolan's action brought pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), regarding his

constitutional conditions of confinement claims. (11 CV 1565, R. 20, 10/19/11 Mem. Op., & Order.) The Court also bases the background facts on Nolan's filings in his other federal court proceedings, including the stipulation of uncontested facts in the present lawsuit and Nolan's written plea agreement in 09 CR 860.

On or about February 26, 2009, federal authorities detained Nolan and placed him in administrative detention at the MCC based on an extradition warrant issued by the Republic of Costa Rica. The warrant alleged aggravated kidnaping, murder, and use of a false document. On August 31, 2009, a Magistrate Judge determined that no probable cause existed for the kidnaping and murder charges, and thus denied the extradition request on those charges. The Magistrate Judge granted the extradition petition on the false document charge, but the United States ultimately dismissed that charge against Nolan.

On October 20, 2009, while Nolan was in administrative detention at the MCC, a grand jury returned an indictment charging Nolan with four counts of possessing prohibited objects while in federal custody and one count of obstruction of justice. A Magistrate Judge denied Nolan's motion for release from custody on November 20, 2009, therefore, from October 20, 2009, until July 7, 2010, Nolan's status was that of a pre-trial detainee. The October 2009 indictment specifically charged that Nolan made or acquired several items to facilitate an escape from the MCC. Also, while detained at the MCC, Nolan communicated to an individual about destroying certain materials at his home related to the Costa Rica extradition case–facts that formed the basis of the obstruction of justice charge. On May 20, 2010, Nolan entered into a guilty plea to counts one and five of the indictment. On July 7, 2010, the district court sentenced Nolan to a total term of fourteen months in prison. Nolan was released from the MCC on August

6, 2010.

During his confinement at the MCC, Nolan was housed in the special housing unit ("SHU") based on several factors, including that Nolan had served in a specialized regiment within the British Army, which had taught him unique military training and skills. According to the MCC warden, extra security measures remained necessary because of Nolan's conduct underlying the October 2009 indictment. In his previous *Bivens* action, Nolan alleged that his detainment in the SHU either caused or worsened his anxiety, depression, attention deficit disorder, and post-traumatic stress disorder ("PTSD"). On October 19, 2011, the district court in the *Bivens* action granted the defendants' motion to dismiss the individual officials based on qualified immunity. Nolan then voluntarily dismissed the remainder of the *Bivens* action on February 8, 2012, after bringing the present FTCA lawsuit on January 12, 2012. In the present lawsuit, Nolan alleges a medical malpractice claim in relation to his PTSD, attention deficit hyperactivity disorder ("ADHD"), anxiety, and depression. Nolan, however, has not brought a claim challenging the conditions of his confinement.

## II.     Dr. Ostrov's Qualifications and Report

Dr. Eric Ostrov received his Ph.D in Human Development/Clinical Psychology from the University of Chicago in 1974. In 1980, Dr. Ostrov received his J.D. from the University of Chicago. He is a licensed clinical psychologist, a member of the American Board of Professional Psychology, and a diplomate in forensic psychology. From 1981 to the present, Dr. Ostrov has worked as a forensic psychologist administering psychological evaluations and assessments and providing testimony regarding civil, criminal, and administrative litigation-related issues.

Also, Dr. Ostrov works as the Senior Clinical Consultant for the Kane County Diagnostic Center in Batavia, Illinois; conducts or supervises fitness for duty evaluations for the Chicago Police Department, the FBI, the DEA, and municipal fire protection districts; and maintains a private psychotherapy practice in Zihuatanejo, Mexico. From 1982 until 1991, Dr. Ostrov held the position of Director of Public Safety Evaluation at the Isaac Ray Center in Chicago, where he was responsible for assessing whether police and other public safety officers were too psychologically disturbed to serve on active duty or whether they were psychologically prepared to return to work. In addition, Dr. Ostrov has authored numerous research articles and presentations in various fields, including police/fire safety psychology, forensic psychology, social security disability evaluations, legal issues for mental health providers, and adolescent psychology.

On May 29, 30, and June 10, 2014, Dr. Ostrov conducted a series of interviews and psychological testing of Nolan, including: (1) the Personal History Checklist for Adults; (2) the Symptom Checklist-90-Revised; (3) the Shipley Institute for Living Scale 2; (4) the Personality Assessment Inventory; (5) the Substance Abuse Subtle Screening Inventory, and (6) the Trauma Symptom Inventory-2. In forming his opinions, Dr. Ostrov also reviewed an email from Nolan's mother describing Nolan as a child and the records of Nolan's treating psychiatrist, Dr. Robert Reff.[1]

Based on the his interviews of Nolan, the above-described testing, Dr. Reff's records, and the email from Nolan's mother, Dr. Ostrov concluded that Nolan's experiences while in custody

---

[1] Pursuant to Dr. Reff's August 25, 2015, *Daubert* hearing testimony, Dr. Reff did not maintain notes of his psychotherapy sessions with Nolan from 2005 to 2013. (8/25/15, Hr'g Tr., at 28-29.)

in SHU traumatized him. In particular, Dr. Ostrov set forth the following opinions in his expert report:

> 1. Traumatic events can include emotionally devastating experiences. Mr. Nolan was traumatized by his experiences while in solitary confinement at the Metropolitan Correctional Center.
>
> 2. Mr. Nolan likely was particularly vulnerable to the experiences he had at the MCC given his hyperactivity and need for stimulation. In addition, he felt abandoned and helpless, unable to help his conjugal family or share his mother's and brothers' grief over the loss of their husband/father. He was afflicted with various physical ailments which were not properly cared for in contrast to the image he had of himself as highly physically fit and competent. He experienced a great sense of injustice in regard to what was being done to him and a profound sense of helplessness vis a vis his inability to do anything about that.
>
> 3. At this time, Mr. Nolan is suffering from marked symptoms of depression and PTSD. His symptoms tend to be self-reinforcing in that he experiences himself as not being competent, not able to contribute, as weak and emotionally out of control. These symptoms, to his great distress, contrast with his prior pride in being a highly competent soldier and a good father and husband.
>
> 4. The evidence strongly indicates that experiences Mr. Nolan had at the MCC have caused the symptoms of posttraumatic stress, despair, depression, anxiety, and anger he continues to struggle with.
>
> 5. Mr. Nolan has experienced, among other symptoms, the following consequences of the trauma he has suffered: symptoms of anxiety including feeling tense or keyed up, trouble concentrating, worrying too much, difficulty sleeping, and feeling something bad is going to happen to him; symptoms of depression including self-blame, feeling guilty, feeling inferior to others, irritability, low energy, feeling no interest in things, feeling everything is an effort, feeling blocked in getting things done and feeling hopeless about the future; anger including temper outbursts he cannot control and threatening to hurt people, and strained interpersonal relationships including feeling critical of others, feeling most people can't be trusted, and getting into frequent arguments.
>
> 6. Specific symptoms of PTSD manifested by Mr. Nolan caused by the experiences he had at the MCC include:
>
>    • Intense psychological distress at exposure to cues that symbolize or resemble an aspect of the traumatic events

- Reliving the traumatic experiences

- Repeated unpleasant thoughts that won't leave his mind

- Hypervigilance

- Thoughts and images of a frightening nature

- Nightmares, disturbing dreams

- Low self-esteem

- Symptoms of anxiety, fearfulness and depression, feeling hopeless

- Difficulty falling and staying asleep

- Interpersonal alienation, difficulty trusting others

(R. 114-4, 6/13/14, Ostrov Report, at 16-17.)

## DAUBERT STANDARD

"A district court's decision to exclude expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993)." *Brown v. Burlington No. Santa Fe Ry. Co.*, 765 F.3d 765, 771 (7th Cir. 2014). "The rubric for evaluating the admissibility of expert evidence considers whether the expert was qualified, whether his methodology was scientifically reliable, and whether the testimony would have assisted the trier of fact in understanding the evidence or in determining the fact in issue." *Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 817 (7th Cir. 2014); *see also Manpower, Inc. v. Ins. Co. of Pa.* 732 F.3d 796, 806 (7th Cir. 2013) (Rule 702 "requires that the trial judge ensure that any and all expert testimony or evidence admitted 'is not only relevant, but reliable.'") (citation omitted).

Further, a district court's inquiry under Rule 702 and *Daubert* is a flexible one and

6

district courts have wide latitude in performing this gate-keeping function. *See Hartman,* 758 F.3d at 818. In other words, although appellate courts review, de novo, whether district courts properly apply the *Daubert* framework, the ultimate decision whether to admit expert testimony is within the district court's sound discretion. *See Stuhlmacher v. Home Depot U.S.A., Inc.,* 774 F.3d 405, 409 (7th Cir. 2014). "'[T]he key to the gate is not the ultimate correctness of the expert's conclusions,'" rather, "'it is the soundness and care with which the expert arrived at her opinion[.]'" *C.W. ex rel. Wood v. Textron, Inc.*, ___ F.3d ___, 2015 WL 5023926 (7th Cir. Aug. 26, 2015) (quoting *Schultz v. Akzo Nobel Paints, LLC,* 721 F.3d 426, 431 (7th Cir. 2013) (citations omitted)). Last, the "proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis v. Citgo Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009).

## MEDICAL MALPRACTICE STANDARD

"The Federal Tort Claims Act makes the federal government liable for acts or omissions by its employees that would be torts in the state in which they occurred had they been committed by someone other than a federal employee." *Glade ex rel. Lundskow v. United States*, 692 F.3d 718, 721 (7th Cir. 2012); *see also Keller v. United States,* 771 F.3d 1021, 1022 (7th Cir. 2014) ("Prisoners can sue under the FTCA 'to recover damages from the United States Government for personal injuries sustained during confinement in a federal prison, by reason of the negligence of a government employee.'") (citation omitted)). Because the alleged medical malpractice took place in Illinois, the Court turns to Illinois' substantive law. *See Bueschel v. United States,* 746 F.3d 753, 763-64 (7th Cir. 2014); *Morisch v. United States*, 653 F.3d 522, 530 (7th Cir. 2011). To succeed on his medical malpractice claim under Illinois law, Nolan must prove: "(1) the

7

proper standard of care by which a physician's conduct may be measured, (2) a negligent failure to comply with the applicable standard, and (3) a resulting injury proximately caused by the physician's lack of skill or care." *Walsh v. Chez,* 583 F.3d 990, 995 (7th Cir. 2009) (quotation omitted); *see also Wipf v. Kowalski,* 519 F.3d 380, 384 (7th Cir. 2008).

## ANALYSIS

Defendant moves to exclude Dr. Ostrov's expert opinion pursuant to *Daubert* and Rule 702 in relation to his testimony on causation, namely, that Nolan's confinement in the SHU caused his PTSD and other psychological symptoms. Under Illinois law, "[p]roximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *Morisch*, 653 F.3d at 531 (quoting *Johnson v. Loyola Univ. Med. Ctr.*, 384 Ill.App.3d 115, 323 Ill.Dec. 253, 893 N.E.2d 267, 272 (1st Dist. 2008) (quotation omitted). To establish proximate cause in a medical malpractice case under Illinois law, "a plaintiff must satisfy two requirements: cause in fact and legal cause." *LaSalle Bank, N.A. v. C/HCA Dev. Corp.,* 384 Ill.App.3d 806, 828, 893 N.E.2d 949, 970, 323 Ill.Dec. 475, 496 (1st Dist. 2008). "[T]o prove cause in fact, a plaintiff must show, within a reasonable degree of medical certainty, that defendants' breach of the standard of care was more probably than not a proximate cause of the resulting injury." *Id.* "[T]o prove legal cause, a plaintiff must also show that 'an injury was foreseeable as the type of harm that a reasonable person would expect to see as a likely result of his or her conduct.'" *Id.* (quoting *Bergman v. Kelsey,* 375 Ill.App.3d 612, 625, 313 Ill.Dec. 862, 873 N.E.2d 486 (1st Dist. 2007)).

Here, Defendant argues that the Court must exclude Dr. Ostrov's causation testimony

8

because: (1) Dr. Ostrov lacks expertise regarding solitary confinement or its effects; (2) Dr. Ostrov's opinion is unreliable because it is based upon insufficient data and not based upon any valid scientific methodology; and (3) Dr. Ostrov's opinion testimony is not helpful because it does not address the relevant issue in the case, namely, Dr. Ostrov does not link Nolan's PTSD and psychological symptoms with the conduct of the MCC's psychologist, Dr. Jason Dana, Ph.D, and the MCC's internist, Dr. Paul Harvey, M.D. The Court turns to Defendant's third argument because it is dispositive.

Defendant argues that Nolan has failed to demonstrate that Dr. Ostrov's causation testimony is relevant to the present medical malpractice claim because it will not help the trier of fact in determining whether Drs. Dana's and Harvey's alleged "breach of the standard of care was more probably than not a proximate cause of his injuries." *See LaSalle Bank,* 384 Ill.App.3d at 828. As *Daubert* teaches, Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.' This condition goes primarily to relevance." *Id.* at 591. In other words, "*Daubert* instructs that expert testimony must be relevant and factually linked to the case in order to meet Rule 702's 'helpfulness' requirement." *United States v. Gallardo,* 497 F.3d 727, 733 (7th Cir. 2007); *see also Rodefer v. Hill's Pet Nutrition, Inc.,* No. IP 01-123-C H/K, 2003 WL 23096486, at *5 (S.D. Ind. 2003) (Hamilton, J.) ("Evidence is relevant under *Daubert* if it is "helpful" to the trier of fact and "fits" the issues in the case.").

In his expert report, Dr. Ostrov alludes to "experiences Mr. Nolan had at the MCC" and states that Nolan experienced "various physical ailments which were not properly cared for." At his deposition, Dr. Ostrov mentions that Nolan had a sinus infection, an ear problem, and skin

9

cancer that Nolan claims were not treated,[2] but never speaks to Drs. Dana's or Harvey's treatment of Nolan in connection to his mental health care issues. In his expert report, Dr. Ostrov further states that Nolan "experienced a great sense of injustice in regard to what was being done to him," but at no point in his report or at his deposition does Dr. Ostrov opine that Drs. Dana's and/or Dr. Harvey's breach of the standard of care caused or aggravated Nolan's PTSD or other psychological symptoms. Instead, Dr. Ostrov explained that the prison conditions, such as the filthy environment, the lack of privacy, and that Nolan had no way to busy himself, caused Nolan's PTSD and other symptoms. (R. 114-5, Ostrov Dep., at 213-14, 236.) In short, in his report and at his deposition, Dr. Ostrov opines that the conditions of Nolan's confinement caused Nolan's PTSD and other psychological symptoms. As discussed, in 2011, Nolan brought a constitutional conditions of confinement claim pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), against various MCC officials. Judge Zagel dismissed Nolan's constitutional claims against the individual MCC officials based on qualified immunity on October 19, 2011. By agreement of the parties, Judge Zagel dismissed the remainder of the lawsuit on February 8, 2012. As such, there are no pending constitutional claims against any MCC officials in relation to Nolan's conditions of confinement allegations.

More importantly, Dr. Ostrov testified that he did not make any findings of malpractice in his report because he had no basis for doing so, namely, he did not review any MCC records and did not talk to MCC staff in forming his expert opinions. (*Id.*, at 73, 210.) More

---

[2] In the August 6, 2015, Final Pre-trial Order, Plaintiff waived his claims concerning his staph infection and obstruction in his ear, the actinic keratosis legion, and other skin lesions and skin disorders. (R. 111, Final Pre-trial Order, Claim Waiver, at 27.)

specifically, at his deposition, counsel asked Dr. Ostrov: "And you also didn't – have not in your report made any findings of malpractice by anyone on the MCC staff, correct?" (*Id.* at 210.) Dr. Ostrov answered, "I wouldn't – I didn't even approach that. I have no basis for doing that, and I did not." (*Id.*) Counsel then asked: "Why do you say you have no basis for doing that?" (*Id.*) Dr. Ostrov articulated, "I haven't talked to them. I haven't heard their side of the story. There is no way that I would opine something like that." (*Id.*) Moreover, when testifying to his understanding about the issues in this lawsuit, Dr. Ostrov stated that his testimony is relevant to "the issue of [Nolan's] confinement at the MCC and the conditions of that confinement at the MCC and the psychological affects and particularly the deleterious psychological affects of his confinement during that time." (*Id.* at 59.) Nolan's present claim, however, is not based on the conditions of his confinement at the MCC, but is a medical malpractice claim in which Nolan must provide expert testimony that Drs. Dana's and Harvey's breach of the standard of care caused his PTSD and aggravated his other psychological symptoms. *See LaSalle Bank,* 384 Ill.App.3d at 828. Dr. Ostrov–by his own admission–does not provide this necessary testimony. Because Dr. Ostrov does not link Nolan's PTSD or other any other psychological symptoms to Drs. Dana's and Harvey's alleged breach of the standard of care, Dr. Ostrov's causation testimony is not relevant or helpful, especially because he admits that he did not make any findings regarding Nolan's malpractice allegations. *See Gallardo,* 497 F.3d at 733; *see also Kunz v. DeFelice,* 538 F.3d 667, 676 (7th Cir. 2008). Simply put, Dr. Ostrov's expert opinion would not assist the trier of fact in determining whether Drs. Dana's and Harvey's alleged breach of the standard of care caused Nolan's psychological injuries. *See Daubert,* 509 U.S. at 591; *Goswami v. DePaul Univ.,* 8 F.Supp.3d 1019, 1030

(N.D. Ill. 2014).

On a final note, in his response brief, Nolan did not address Defendant's argument that Dr. Ostrov failed to link Nolan's symptoms to the alleged breach by Drs. Dana and Harvey, which further supports the Court's conclusion that Dr. Ostrov's expert testimony as to causation is not helpful under *Daubert*. *See Steen v. Myers*, 486 F.3d 1017, 1020-21 (7th Cir. 2007) (absence of discussion in brief amounts to abandonment of claims).

## CONCLUSION

For these reasons, the Court, in its discretion, grants Defendant's *Daubert* motion to exclude the expert testimony of Dr. Eric Ostrov regarding causation.

**Dated:** August 31, 2015

ENTERED

_____
**AMY J. ST. EVE**
**United States District Court Judge**