**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MATTHEW NOLAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12 C 0247 |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM, OPINION, AND ORDER

AMY J. ST. EVE, District Court Judge:

On June 16, 2014, Plaintiff Matthew Nolan ("Nolan") filed a First Amended Complaint against Defendant United States under the Federal Tort Claims Act ("FTCA") alleging a medical malpractice claim based on events occurring while he was detained by the Federal Bureau of Prisons at the Metropolitan Correctional Center ("MCC") in Chicago, Illinois. *See* 28 U.S.C. §§ 1346, 2671, *et seq.* On August 6, 2015, Defendant moved to exclude the expert testimony of Dr. Robert Reff pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). After the parties fully briefed the present motion, on August 25, 2015, the Court held a *Daubert* hearing during which Dr. Reff testified. For the following reasons, the Court, in its discretion, grants in part and denies in part Defendant's motion to exclude the expert testimony of Dr. Reff. In particular, Nolan has failed in his burden of demonstrating that Dr. Reff's causation opinion satisfies *Daubert*.

**BACKGROUND**

**I.      Factual and Procedural Background**

The following background facts are based on the October 19, 2011, Memorandum,

Opinion, and Order in Nolan's action brought pursuant to *Bivens v. Six Unknown Named Agents*

*of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), regarding his

constitutional conditions of confinement claims.  (11 CV 1565, R. 20, 10/19/11 Mem. Op., &

Order.)  The Court also bases the background facts on Nolan's filings in his other federal court

proceedings, including the stipulation of uncontested facts in the present lawsuit, his bankruptcy

proceedings, and Nolan's written plea agreement in 09 CR 860.

On or about February 26, 2009, federal authorities detained Nolan and placed him in

administrative detention at the MCC based on an extradition warrant issued by the Republic of

Costa Rica.  The warrant alleged aggravated kidnaping, murder, and use of a false document.

On August 31, 2009, a Magistrate Judge determined that no probable cause existed for the

kidnaping and murder charges, and thus denied the extradition request on those charges.  The

Magistrate Judge granted the extradition petition on the false document charge, but the United

States ultimately dismissed that charge against Nolan.

On October 20, 2009, while Nolan was in administrative detention at the MCC, a grand

jury returned an indictment charging Nolan with four counts of possessing prohibited objects

while in federal custody and one count of obstruction of justice.  A Magistrate Judge denied

Nolan's motion for release from custody on November 20, 2009, therefore, from October 20,

2009, until July 7, 2010, Nolan's status was that of a pre-trial detainee.  The October 2009

indictment specifically charged that Nolan made or acquired several items to facilitate an escape

from the MCC. Also, while detained at the MCC, Nolan communicated to an individual about destroying certain materials at his home related to the Costa Rica extradition case–facts that formed the basis of the obstruction of justice charge. On May 20, 2010, Nolan entered into a guilty plea to counts one and five of the indictment. On July 7, 2010, the district court sentenced Nolan to a total term of fourteen months in prison. Nolan was released from the MCC on August 6, 2010.

During his confinement at the MCC, Nolan was housed in the special housing unit ("SHU") based on several factors, including that Nolan had served in a specialized regiment within the British Army, which had taught him unique military training and skills. According to the MCC warden, extra security measures remained necessary because of Nolan's conduct underlying the October 2009 indictment, including his attempt to facilitate his escape from the MCC. In his previous *Bivens* action, Nolan alleged that his detainment in the SHU either caused or worsened his anxiety, depression, attention deficit disorder, and post-traumatic stress disorder ("PTSD"). On October 19, 2011, the district court in the *Bivens* action granted the defendants' motion to dismiss the individual officials based on qualified immunity. Nolan then voluntarily dismissed the remainder of his *Bivens* action on February 8, 2012, after bringing the present FTCA lawsuit on January 12, 2012. In the present lawsuit, Nolan alleges a medical malpractice claim in relation to his PTSD, attention deficit hyperactivity disorder ("ADHD"), anxiety, and depression. Nolan, however, has not brought a claim challenging the conditions of his confinement.

## II.    Dr. Reff's Qualifications

Dr. Reff began treating Nolan in April 2005 until Nolan's incarceration at the MCC beginning in early 2009.  During Nolan's incarceration from early 2009 until his release in August 2010, Dr. Reff did not visit Nolan at the MCC nor treat him during this time period.  Dr. Reff began treating Nolan again upon his release from the MCC in 2010.

In his response to the present *Daubert* motion, Nolan asserts that Dr. Reff's testimony "is offered to establish the mental health status of Matthew Nolan before he was taken into custody and held in solitary confinement; Matthew Nolan's mental health status upon release from being held in solitary confinement; [] the change in mental health status experienced by Matthew Nolan as a result of the deprivations he suffered while held in solitary confinement; and whether he received mental health treatment while in solitary confinement that met the standard of care required by mental health professionals."  (R. 127, Pl.'s Resp. Brief, at 1-2.)

Dr. Reff is a physician certified to practice in Illinois, Indiana, and Colorado having graduated from the Rosalind Franklin University of Medicine and Science in 1981.  Following graduation, Dr. Reff did his residency in psychiatry at Northwestern University, after which he had a fellowship with Northwestern Memorial Hospital working at the Rehabilitation Institute with patients who suffered trauma and other disabilities.  Dr. Reff has remained affiliated with Northwestern Memorial Hospital for the past 20 years.

Furthermore, Dr. Reff is a faculty member at the Feinberg School of Medicine at Northwestern University in the Department of Psychiatry and Behavioral Sciences and supervises psychiatric residents, who are in the training program at Northwestern Memorial Hospital.  In his private practice, Dr. Reff maintains outpatient offices in Northwest Indiana and

Chicago where he regularly sees patients managing medication and conducting psychotherapy. Also, Dr. Reff consults with corporations and attorneys regarding disability evaluations, psychiatric injuries, appropriateness of treatment, and prognosis. Dr. Reff treats outpatient adults in his private practice for mood disorders, ADHD, anxiety disorders, depression, bipolar disorder, PTSD, chronic pain, and stress-related disorders. On the other hand, Dr. Reff has never treated anyone in solitary confinement or anyone who has been incarcerated.

### III.    Dr. Reff's Expert Opinions

In his October 7, 2013, expert report, Dr. Reff explains that, when forming his opinions, he relied on his treatment of Nolan before and after Nolan was in custody at the MCC; the depositions of Dr. Jason Dana, Ph.d., the MCC's psychologist, and Dr. Paul Harvey, M.D., the MCC's internist; Dr. Dana's psychological reviews and notes regarding Nolan's treatment; a 2006 article published in the *Washington University School of Law's Journal of Law & Policy* by Dr. Stuart Grassian entitled "Psychiatric Effects of Solitary Confinement;" and a journal article authored by Dr. Craig Haney entitled "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement," published in *Crime & Delinquency,* Vol. 49 No. 1, January 2003.

In the present *Daubert* motion, Defendant challenges Dr. Reff's qualifications and opinions focusing on the following language in Dr. Reff's October 7, 2013, expert report:

> It is my opinion that at the very least, Dr. Harvey and/or Dr. Dana could have ameliorated Mr. Nolan's psychological distress by having pursued the available medical information regarding his pre-existing psychiatric condition and treatment. By not having done so, Mr. Nolan was unnecessarily subjected to additional and treatable stressors which significantly contributed to the development of his psychological deterioration while in solitary and ongoing problems since his release. It is my opinion that Mr. Nolan was not treated for ADHD per the established standard of psychiatric practice. It is my opinion that Mr. Nolan clearly suffered from at least a number of the symptoms described by Dr. Grassian in his article. These include impaired sleep, perceptual distortions,

hyper-responsivity to external stimuli such as light or sound, difficulties with thinking/concentration and memory, intrusive obsessional thoughts and problems with impulse control.  As previously stated, Mr. Nolan continues to have problems with his memory, concentration, focus and thinking.  He is not as hyper-vigilant as he had been when released from incarceration.  He is not as hyper-responsive to external stimuli though this condition persisted upon his release for many months.  He no longer experiences perceptual distortions.  He continues to have problems reintegrating to the community at large as well as has ongoing problems with social interactions.

The above opinions are based on my work with Matthew Nolan, my experience as a Board Certified Psychiatrist, diagnostic criteria from the DSM IV TR, review of articles by Dr. Stuart Grassian and Dr. Craig Haney, and a reasonable degree of medical psychiatric certainty.

(R. 114-2, 10/07/13, Reff Report, at 7.)

## DAUBERT STANDARD

"A district court's decision to exclude expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993)."  *Brown v. Burlington No. Santa Fe Ry. Co.*, 765 F.3d 765, 771 (7th Cir. 2014).  "The rubric for evaluating the admissibility of expert evidence considers whether the expert was qualified, whether his methodology was scientifically reliable, and whether the testimony would have assisted the trier of fact in understanding the evidence or in determining the fact in issue."  *Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 817 (7th Cir. 2014); *see also Manpower, Inc. v. Ins. Co. of Pa.* 732 F.3d 796, 806 (7th Cir. 2013) (Rule 702 "requires that the trial judge ensure that any and all expert testimony or evidence admitted 'is not only relevant, but reliable.'") (citation omitted).

A district court's evaluation of expert testimony under *Daubert* does not "take the place of the jury to decide ultimate issues of credibility and accuracy."  *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012).  Once it is determined that "the proposed expert testimony meets the

*Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Id.* (citation omitted). Also, a district court's inquiry under Rule 702 and *Daubert* is a flexible one and district courts have wide latitude in performing this gate-keeping function. *See Hartman,* 758 F.3d at 818. "'[T]he key to the gate is not the ultimate correctness of the expert's conclusions,'" rather, "'it is the soundness and care with which the expert arrived at her opinion[.]'" *C.W. ex rel. Wood v. Textron, Inc.,* ___ F.3d ___, 2015 WL 5023926, at *5 (7th Cir. Aug. 26, 2015) (quoting *Schultz v. Akzo Nobel Paints, LLC,* 721 F.3d 426, 431 (7th Cir. 2013) (citations omitted)). Last, the "proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis v. Citgo Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009).

## MEDICAL MALPRACTICE STANDARD

"The Federal Tort Claims Act makes the federal government liable for acts or omissions by its employees that would be torts in the state in which they occurred had they been committed by someone other than a federal employee." *Glade ex rel. Lundskow v. United States*, 692 F.3d 718, 721 (7th Cir. 2012); *see also Keller v. United States,* 771 F.3d 1021, 1022 (7th Cir. 2014) ("Prisoners can sue under the FTCA 'to recover damages from the United States Government for personal injuries sustained during confinement in a federal prison, by reason of the negligence of a government employee.'") (citation omitted)). Because the alleged medical malpractice took place in Illinois, the Court turns to Illinois' substantive law. *See Bueschel v. United States,* 746 F.3d 753, 763-64 (7th Cir. 2014); *Morisch v. United States*, 653 F.3d 522, 530 (7th Cir. 2011).

To succeed on his medical malpractice claim under Illinois law, Nolan must prove: "(1) the proper standard of care by which a physician's conduct may be measured, (2) a negligent failure to comply with the applicable standard, and (3) a resulting injury proximately caused by the physician's lack of skill or care." *Walsh v. Chez,* 583 F.3d 990, 995 (7th Cir. 2009) (quotation omitted); *see also Wipf v. Kowalski,* 519 F.3d 380, 384 (7th Cir. 2008). "Unless the physician's negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson, expert medical testimony is required to establish the standard of care and the defendant physician's deviation from that standard." *Massey v. United States,* 312 F.3d 272, 280 (7th Cir. 2002); *see also Wipf,* 519 F.3d at 384.

## ANALYSIS

In the present *Daubert* motion, Defendant challenges Dr. Reff's disclosed expert opinion testimony as to: (1) the appropriate standard of care; (2) the breach of the standard of care; and (3) causation, namely, that the lack of proper psychological care at the MCC, including the failure to properly medicate Nolan's ADHD, contributed to Nolan's psychological deterioration while in custody, his ongoing problems since his release, and also caused his PTSD. The Court first turns to Dr. Reff's opinions as to the appropriate standard of care and the deviation or breach of that standard.

## I.     Standard of Care and Deviation

### A.     Relevant Standard of Care

"In determining the appropriate standard of care, Illinois follows the 'similar locality' rule, 'which requires physicians to possess and apply the knowledge, skill, and care which a reasonably well-qualified physician in the same or similar community would bring to a similar

case.'" *Wilbourn v. Cavalenes,* 398 Ill.App.3d 837, 853, 923 N.E.2d 937, 953, 338 Ill.Dec. 77, 93 (1st Dist. 2010) (citation omitted). Under this standard, "an expert will be qualified to testify as to the standard of care in a medical malpractice case if (1) the expert is familiar with the standards of care applicable to a reasonably well-qualified physician in the same or similar locality of treatment or (2) certain nationally uniform, minimum standard[s] exist despite the locality of treatment, and the expert is familiar with those standards." *Id.* at 854 (citing *Purtill v. Hess*, 111 Ill.2d 229, 246, 95 Ill.Dec. 305, 489 N.E.2d 867, 874 (1986)).

In essence, Nolan asserts that there is a uniform standard of care, namely, that the general standard for mental health care applies to patients who are in custody, as well as those who are in the outside community. Indeed, the Illinois Appellate Court has held, "[i]f it has not already been recognized, we now hold that those practicing the medical arts in the penitentiary are held to the same standard of care as those practicing in the communities of our State." *Moss v. Miller,* 254 Ill.App.3d 174, 184-85, 625 N.E.2d 1044, 105, 192 Ill.Dec. 889, 896 (4th Dist. 1993). In discussing the standard of care in an Illinois medical malpractice case involving a state inmate, the Seventh Circuit concluded that a jury instruction including the language that the defendant doctor "owe[d] the plaintiff the same duty of care owed to patients in private practice" was proper under Illinois law and supported by Illinois Pattern Jury Instruction Civil § 105.01. *See Chambers v. Ingram,* 858 F.2d 351, 356 (7th Cir. 1988) (citing *Purtill*, 489 N.E.2d 872). As such, although the Federal Bureau of Prisons Clinical Practice Guidelines and the Federal Bureau of Prisons Health Services National Formulary will assist the trier of fact in understanding the expert testimony regarding the standard of care, these guidelines do not establish the standard of care in federal prisons for medical malpractice cases under Illinois law.

*See, e.g., Gevas v. McCann,* No. 08 C 3074, 2014 WL 2926201, at *4 (N.D. Ill. June 27, 2014).[1]

Nonetheless, Defendant maintains that Dr. Reff does not have the requisite qualifications to testify as to the relevant standard of mental health care in prisons because he does not have any experience in prison health care or solitary confinement.  Specifically, at his deposition and at the *Daubert* hearing, Dr. Reff acknowledged that, other than Nolan, he has never treated anyone who has been in solitary confinement or the SHU.  Dr. Reff further testified that he has never been inside the MCC and knows nothing about its medication rules and restrictions, including the formulary restrictions.  When forming his opinions, Dr. Reff did not review all of Nolan's MCC records or other Federal Bureau of Prison reports or administrative records.  Dr. Reff also admits that he had no contact with Nolan and did not treat him while he was detained at the MCC.

As discussed, however, the relevant standard of care is the general area of psychology and psychiatry–not a particularized prison mental health care standard–and the Court would be hard-pressed to conclude that Dr. Reff, a clinical psychiatrist with decades of experience in his field, is not qualified to testify about the standard of care under the circumstances.  Indeed, Dr. Reff's credentials and experience render him highly qualified to testify to the standard of care in psychology and psychiatry.  Therefore, the Court, in its discretion, denies Defendant's motion to exclude Dr. Reff's opinion testimony regarding the proper standard of care.

---

[1]  Defendant's reliance on prisoners' civil rights cases for the relevant standard of care is misplaced.  As Defendant repeatedly argues in its legal memoranda, this is a medical malpractice action and not a constitutional conditions of confinement case.

**B.      Breach of the Standard of Care**

The Court's analysis of whether Dr. Reff is qualified to testify to the alleged breach of the standard of care, and ultimately causation, does not end there because "[w]hether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy,* 593 F.3d 610, 618 (7th Cir. 2010) (internal quote and citation omitted).  To clarify, the relevant question "is not whether an expert witness is qualified in general, but whether his 'qualifications provide a foundation for [him] to answer a specific question.'" *Id.* at 617 (citation omitted).

With this in mind, the Court turns to Dr. Reff's opinion testimony that Drs. Dana and Harvey breached the established psychological or psychiatric standard of care when treating Nolan at the MCC.  Under Illinois law, a physician breaches the standard of care if he fails to use "reasonable skill such as physicians in good practice ordinarily use and would bring to a similar case." *Cummings v. Jha*, 394 Ill.App.3d 439, 452, 333 Ill.Dec. 837, 915 N.E.2d 908, 920 (5th Dist. 2009).  "The determination of whether a doctor acted in compliance with the applicable standard of care is limited, by definition, to the circumstances with which he was confronted at the time the medical service was rendered." *Steele v. Provena Hosp.,* 996 N.E.2d 711, 722, 374 Ill.Dec. 1016, 1027 (3d Dist. 2013).

**1.      Non-Disclosed Opinions**

Comparing Dr. Reff's expert report to his deposition testimony and his testimony at the August 2015 *Daubert* hearing, Dr. Reff's opinion on how Drs. Dana and Harvey breached the standard of care is somewhat of a moving target.  In his October 2013 expert report, Dr. Reff

opined that Drs. Dana and Harvey breached the standard of care by not properly treating Nolan's ADHD and by failing to obtain records or a verbal consultation with Nolan's former treatment providers concerning his pre-existing mental health care conditions. At his deposition and at the *Daubert* hearing, Dr. Reff also mentioned that Drs. Dana and Harvey breached the relevant standard of care by not conducting individual psychotherapy, although at his deposition, Dr. Reff backed away from this opinion.

Similarly, at his deposition and the *Daubert* hearing, Dr. Reff posited that the standard of care was breached because Nolan did not have the opportunity to discuss his psychological issues with Dr. Dana in a private or contained environment while he was in the SHU. In his October 2013 expert report, Dr. Reff mentioned that Dr. Dana spoke with Nolan through the door of the cell and that Nolan had a sense that anything he said to Dr. Dana was not confidential. Dr. Reff further explained in his report that Nolan was reticent to describe how he was feeling because he feared that other MCC inmates or detainees would use this information against him. Even though Dr. Reff described this situation in his expert report, he never opined that Dr. Dana breached the standard of care by failing to conduct his conversations with Nolan in private.[2]

As such, Dr. Reff did not properly disclose his breach opinions concerning psychotherapy and private consultation in his October 2013 expert report under Federal Rule of Civil Procedure 26(a)(2), which requires that an expert must disclose a "complete statement of

---

[2] At the *Daubert* hearing, the Court gave Nolan's counsel the opportunity to identify where Dr. Reff disclosed this opinion in his expert report. (8/25/15 Hr'g Tr., at 37.) To date, counsel has not identify any such disclosure. Indeed, after a careful review of Dr. Reff's expert report, this opinion was not disclosed.

all opinions [he] will express and the basis and reasons for them." *See Novak v. Board of Trs. of So. Ill. Univ.,* 777 F.3d 966, 972 (7th Cir. 2015). "Failure to comply with the disclosure requirements of Rule 26(a) results in automatic and mandatory exclusion ... 'unless the failure was substantially justified or is harmless.'" *Id.* (quoting Fed.R.Civ.P. 37(c)(1)); *see also Rossi v. City of Chicago,* 790 F.3d 729, 738 (7th Cir. 2015). With less than two weeks until trial, the prejudice against Defendant in failing to disclose these opinions and their bases is insurmountable. *See Tribble v. Evangelides,* 670 F.3d 753, 760 (7th Cir. 2012); *David v. Caterpillar, Inc.,* 324 F.3d 851, 857 (7th Cir. 2003). Moreover, there is nothing in the record indicating that Dr. Reff's failure to disclose these opinions is substantially justified. *See Rossi,* 790 F.3d at 738; *Novak,* 777 F.3d at 972. Therefore, Nolan cannot rely on these non-disclosed opinions in relation to Drs. Dana's and Harvey's breach of the standard of care.

### 2. Properly Disclosed Opinions

Turning to the opinions disclosed in his expert report, Dr. Reff opined that Drs. Harvey and Dana breached the psychiatric or psychological standard of care by not treating Nolan's ADHD with Adderall, which contains amphetamine-like agents, or with Strattera, a non-amphetamine stimulant.[3] Instead, Dr. Harvey prescribed the antidepressant Venlafaxine for Nolan, which Dr. Reff admits provided Nolan a benefit due to its serotonin enhancing qualities, but was not appropriate for treating ADHD. At his deposition, Dr. Reff stated that using

---

[3] The parties do not dispute that Adderall and Strattera are not included in the Federal Bureau of Prisons Health Services National Formulary. In other words, Adderall and Strattera are "non-formulary." *See* http://www.bop.gov/resources/pdfs/formulary.pdf. Moreover, as Defendant readily admits, the present *Daubert* motion is not the appropriate procedural mechanism for the Court to consider whether treating Nolan with formulary medications instead of Adderall or Strattera falls under the FTCA's discretionary function exception pursuant to 28 U.S.C. § 2680(a). *See Keller v. United States,* 771 F.3d 1021, 1022-23 (7th Cir. 2014).

Venlafaxine "was a treatment of expediency because of whatever the rules and regulations of the MCC are regarding the use of stimulants." (R. 114-3, Reff Dep., at 138.) At the *Daubert* hearing, Dr. Reff explained in detail why treating ADHD with Venlafaxine is not as effective as Adderall or Strattera.

Further, Dr. Reff opined in his October 2013 expert report that Drs. Harvey and Dana breached the psychological standard of care by failing to obtain Nolan's medical records or consult with Nolan's former mental health care providers. By failing to do so, Dr. Reff posits that Drs. Harvey and Dana did not review any prior treatment information to corroborate or substantiate that Nolan had been treated for certain conditions in the past, including ADHD. Specifically, in his report, Dr. Reff opined that "at the very least, Dr. Harvey and/or Dr. Dana could have ameliorated Mr. Nolan's psychological distress by having pursued the available medical information regarding his pre-existing psychiatric condition and treatment" and by "not having done so, Mr. Nolan was unnecessarily subjected to additional and treatable stressors which significantly contributed to the development of his psychological deterioration while in solitary and ongoing problems since his release." (Reff Report, at 7.) Similarly, at the *Daubert* hearing, Dr. Reff explained that had Nolan received the appropriate treatment for his psychological issues, the severity of his symptoms would have been mitigated.

Dr. Reff's opinions as to his diagnosis of Nolan and Drs. Dana's and Harvey's breach of the standard of care are founded on sufficient data and he utilizes the proper method of the relevant discipline, namely, clinical psychiatry (as opposed to laboratory or research medical science). *See Bielskis v. Louisville Ladder, Inc.,* 663 F.3d 887, 894 (7th Cir. 2011) (an expert's opinion "must be reasoned and founded on data [and] must also utilize the methods of the

relevant discipline"). Generally speaking, in "clinical medicine, the methodology of physical examination and self-reported medical history" is appropriate. *Cooper v. Carl A. Nelson & Co.,* 211 F.3d 1008, 1020 (7th Cir. 2000); *see also Brown,* 765 F.3d at 772 ("Medical professionals reasonably may be expected to rely on self-reported patient histories") (citation omitted). Accordingly, Dr. Reff's reliance on Nolan's self-reported medical history concerning his past diagnosis of ADHD is an acceptable basis under the circumstances, despite Defendant's argument to the contrary. Further, Dr. Reff's reliance on Dr. Dana's treatment notes and Drs. Dana's and Harvey's deposition transcripts was sufficiently reliable. *See Walker v. Soo Line R. Co.,* 208 F.3d 581, 588 (7th Cir. 2000) ("courts frequently have pointed to an expert's reliance on the reports of others as an indication that their testimony is reliable"). That Dr. Reff did not rely on other MCC records and Federal Bureau of Prison reports and formularies goes to the weight of Dr. Reff's opinion testimony, not its admissibility. *See Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.,* 782 F.3d 353, 360 (7th Cir. 2015) ("When expert testimony has been admitted under *Daubert*, the 'soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.'") (citation omitted). Because Dr. Reff's expert opinion testimony as to the standard of care and alleged breach meets the *Daubert* threshold of relevance and reliability, the Court, in its discretion, denies this aspect of Defendant's *Daubert* motion.

## II.     Causation

The Court now turns Defendant's argument that Dr. Reff did not base his causation opinions on a scientifically reliable methodology as required by *Daubert*. *See Brown*, 765 F.3d at 772 ("The party offering the expert testimony bears the burden of proving its reliability.").

More specifically, Dr. Reff opined that the lack of proper psychological care at the MCC, including the failure to properly medicate Nolan's ADHD, contributed to Nolan's psychological deterioration while in custody, his ongoing problems since his release, and also caused his PTSD.       Under Illinois law, "[p]roximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *Morisch,* 653 F.3d at 531 (quoting *Johnson v. Loyola Univ. Med. Ctr.*, 384 Ill.App.3d 115, 323 Ill.Dec. 253, 893 N.E.2d 267, 272 (1st Dist. 2008) (quotation omitted).  To establish proximate cause in a medical malpractice case, "a plaintiff must satisfy two requirements: cause in fact and legal cause." *LaSalle Bank, N.A. v. C/HCA Dev. Corp.,* 384 Ill.App.3d 806, 828, 893 N.E.2d 949, 970, 323 Ill.Dec. 475, 496 (1st Dist. 2008).  "[T]o prove cause in fact, a plaintiff must show, within a reasonable degree of medical certainty, that defendants' breach of the standard of care was more probably than not a proximate cause of the resulting injury." *Id.*  "[T]o prove legal cause, a plaintiff must also show that 'an injury was foreseeable as the type of harm that a reasonable person would expect to see as a likely result of his or her conduct.'" *Id.* (quoting *Bergman v. Kelsey,* 375 Ill.App.3d 612, 625, 313 Ill.Dec. 862, 873 N.E.2d 486 (1st Dist. 2007)).

Here, Defendant argues that the Court must exclude Dr. Reff's causation testimony because he failed to use a reliable scientific methodology in forming his opinion, namely, he did not conduct a "differential etiology."  To clarify, "in a differential etiology, the doctor rules in all the potential causes of a patient's ailment and then by systematically ruling out causes that would not apply to the patient, the physician arrives at what is the likely cause of the ailment." *Myers v. Illinois Central R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010); *see also C.W. ex rel. Wood v.*

*Textron, Inc.*, ___ F.3d ___ 2015 WL 5023926, at *2 n.4 (7th Cir. Aug. 26, 2015) ("A differential etiology is a process-of-elimination approach to determining a subject's cause of injury.").  The physician need not rule out every possible cause, but the "goal is to identify the last remaining, or most probable, 'ruled in' cause of a medical problem."  *Erwin v. Johnson & Johnson,* 492 F.3d 901, 903 (7th Cir. 2007).  Even though the Court has not found any legal authority for the proposition that an expert must perform a differential etiology to establish causation, Dr. Reff must have employed a reliable methodology to support his causation opinions.  *See Higgins v. Koch Dev. Corp.,* ___ F.3d ___, 2015 WL 4394895, at **5-6  (7th Cir. July 30, 2015).  "In deciding whether an expert employed a reliable method, the district court has discretion to consider '[w]hether the expert has adequately accounted for obvious alternative explanations.'" *Brown,* 765 F.3d at 773 (quoting *Schultz,* 721 F.3d at 434).  In short, guesswork, subjective impressions, or conjecture are not methods that are widely accepted in the scientific community when making causation determinations.  *See Brown*, 765 F.3d at 773-74; *Lewis,* 561 F.3d at 705.

Here, Defendant points to Dr. Reff's deposition testimony in which he stated that he could not separate out whether Nolan's injuries, including ADHD, major depression, generalized anxiety, and PTSD, were due to his solitary confinement or Drs. Harvey's or Dana's breach of the standard of care.  (R. 114-3, Reff Dep., at 186.)  Specifically, counsel asked Dr. Reff whether he was able to quantify whether the failure to properly treat Nolan's ADHD or his solitary confinement contributed to Nolan's mental health care issues, after which Dr. Reff replied, "I would say the frustrating part of what you're asking is that you're asking me to discount the fact that in addition to ADHD he suffered major depression, generalized anxiety and PTSD and it is

my opinion that you can't separate these out as a whole. This is not–this is all part of the same package. You can't break his brain into sections." (*Id.*) On the second day of his deposition, Dr. Reff testified that "I can't say within a reasonable degree of certainty that [Nolan] has residual symptoms of ADHD as a consequence of not having been treated in MCC. I can say that the symptoms that he continues to manifest of ADHD are worse than they had been prior to being in MCC." (*Id.* at 286-87.) In addition, Dr. Reff stated that "I can't say that his current symptoms are as a consequence of not having gotten Adderall when at the MCC." (*Id.* at 287-88.) A few minutes later in his deposition, Dr. Reff testified that failing to prescribe Adderall "was part of the mix" in aggravating Nolan's symptoms–along with his extended stay in solitary confinement–but was "not solely the reason why." (*Id.* at 297.) At the *Daubert* hearing, however, Dr. Reff unequivocally testified that the cause of Nolan's aggravated ADHD was because he was not prescribed Adderall or an alternative medication that is indicated for the treatment of ADHD. Moreover, he testified to a reasonable degree of medical certainty the lack of appropriate treatment for all of Nolan's psychological conditions contributed to the aggravation of his symptoms. At the *Daubert* stage, however, the Court cannot make credibility determinations based on this inconsistent testimony. *See Lapsley,* 689 F.3d at 804 ("A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy.").

Nevertheless, in forming his causation opinions, Dr. Reff did not account for obvious alternative explanations concerning Nolan's deteriorating mental health except for the fact that Nolan was in solitary confinement during the relevant time period. *See Brown,* 765 F.3d at 773; *Schultz,* 721 F.3d at 434. In response to Defendant's argument that Dr. Reff did not perform a

proper differential etiology, Nolan's counsel explains that Dr. Reff was not required to conduct a differential etiology because there was only one traumatic experience that Nolan suffered–although counsel does not clarify if this traumatic experience is Nolan's detention in the SHU or the lack of medical treatment at the MCC. That Nolan only suffered one traumatic experience is belied by the record, which reveals that Nolan had multiple traumatic experiences surrounding his detention in the SHU, including his arrest on charges of murder and kidnaping in relation to Costa Rica's request for extradition, his fear of being extradited to Costa Rica, his indictment and conviction for making or acquiring several items to facilitate an escape from the MCC and obstruction of justice, and the death of his father. Also, after multiple failed business ventures, Nolan had filed for bankruptcy protection on several occasions, which included a non-dischargeable fraud-based judgment of $600,000 entered by the bankruptcy court on August 12, 2009. (09 B 325, R. 11.)

Dr. Reff did not mention any of these alternative potential causes in his October 2013 expert report, although at his deposition he testified that he was aware that Nolan filed for bankruptcy and had financial stress, that Nolan was subject to proceedings in relation to Costa Rica, and that Nolan's father had died when he was in solitary confinement. Nonetheless, Dr. Reff never stated in his report, at his deposition, or at the *Daubert* hearing whether he considered any these potential alternative causes in forming his causation opinion as to Nolan's ADHD, depression, anxiety disorder, or PTSD or if he "ruled out" or "ruled in" any of these alternatives in his analysis.[4]

---

[4] Dr. Reff's causation analysis regarding Nolan's PTSD is discussed in more detail below. Moreover, the Court discussed the cause of Nolan's PTSD in the August 31, 2015, Memorandum, Opinion, and Order granting Defendant's *Daubert* motion to exclude the

In addition, at the *Daubert* hearing, the Court directly asked Nolan's counsel to clarify what methodology Dr. Reff used in making his causation determinations, to which counsel answered by explaining what Dr. Reff relied upon in making his determinations concerning the breach of the standard of care. (8/25/15 Hr'g Tr., at 88-89.) After counsel answered as such, the Court re-phrased the question asking "[b]ut what methodology did he use to opine on causation?" (*Id.* at 89.) Counsel answered as follows:

> Dr. Reff reviewed the records of Dr. Dana. He was aware of the – at the – there was some confusion about which medical records Dr. Reff reviewed, but he was – he repeatedly has said he was aware of the medication records of Mr. Nolan while in the MCC. He relied on Mr. Nolan's report of what had happened while he was in the MCC, both in terms of his situation and in terms of what the doctors did.

> He read the depositions of Dr. Harvey and Dr. Dana, and he had his own diagnosis of Mr. Nolan. So, putting those all together, he was able to draw a judgment about what – whether – as to what the causation was of the illness.

> And the second causation issue was the harm that flowed from the – through the two causation standards in Illinois law. I think it's legal causation and causation in fact.

> So, he testified that – he utilized these factors I just mentioned to draw his conclusion about what caused the illnesses and their aggravation, and then he also utilized them plus his own diagnosis to conclude what harm flowed from that manifested itself.

(*Id.* at 89-90.) In sum, despite the challenge to Dr. Reff's methodology for his causation opinions, Nolan has failed to establish a reliable methodology.

The Court recognizes that Dr. Reff need not exclude all alternative causes with certainty, *see Gayton*, 593 F.3d at 619, but the failure to consider obvious potential alternative causes of Nolan's psychological symptoms is fatal to Dr. Reff's causation testimony because there is no

_____

causation testimony of Nolan's expert witness Dr. Eric Ostrov.

evidence in the record that he followed a reliable method in forming his causation opinions. *See Brown,* 765 F.3d at 774. Although Dr. Reff admitted at his deposition that he could not separate the failure to treat and Nolan's incarceration in the SHU, he backed off this position at the *Daubert* hearing. In any event, it appears that Dr. Reff relied upon his subjective impressions and guesswork based on his treatment of Nolan before and after his detainment at the MCC. *See Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 826 (7th Cir. 2010) (physician's reliance on "past experience and the temporal proximity...does not an expert opinion make."); *cf. Erwin,* 492 F.3d at 904-05 ("The mere existence of a temporal relationship between taking a medication and the onset of symptoms does not show a sufficient causal relationship."); *see, e.g., Higgins*, 2015 WL 4394895, at *6. Based on Dr. Reff's failure to apply a reliable method in making his causation determinations, the Court, in its discretion, grants Defendant's motion to exclude Dr. Reff's causation testimony. *See Bryant v. City of Chicago,* 200 F.3d 1092, 1098 (7th Cir. 2000) ("district court enjoys broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination."). In other words, although Dr. Reff employed a reliable methodology in diagnosing Nolan and when forming his opinions on the breach of the standard of care, Dr. Reff did not employ a reliable methodology in making his causation determinations. *See Higgins*, 2015 WL 4394895, at *6 ("although a doctor may have 'experience diagnosing and treating'" a condition "'that does not make him qualified to assess its genesis.'") (citation and internal quotation marks omitted).

In addition, although Dr. Reff considered the conditions of Nolan's confinement as a cause of Nolan's psychological symptoms, there are no pending constitutional claims against any MCC officials in relation to Nolan's conditions of confinement allegations. As discussed, in

2011, Nolan's brought a constitutional conditions of confinement claim pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), against various MCC officials.  Judge Zagel dismissed Nolan's constitutional claims against the individual MCC officials based on qualified immunity on October 19, 2011.  (11 CV 1565, R. 20, 10/19/11 Mem. Op., & Order.)  By agreement of the parties, Judge Zagel dismissed the remainder of the lawsuit on February 8, 2012.  Therefore, any allegations concerning Nolan's conditions of confinement in relation to his detainment in the SHU are not before the Court.

Moreover, Dr. Reff did not link Nolan's PTSD to his mental health care treatment at the MCC.  Specifically, at the *Daubert* hearing, Dr. Reff testified to a medical degree of certainty that he believed that the cause of Nolan's PTSD was the environment in which he was subjected to for the seventeen and a half months, namely, his detention at the MCC, along with Nolan's belief that he would be extradited to a foreign country where he would be killed.  Likewise, at his deposition, Dr. Reff testified that Nolan's PTSD was a consequence of Nolan's incarceration in solitary confinement.  (Reff Dep., at 128-29.)  Accordingly, Dr. Reff has not offered an expert opinion that Drs. Dana's and Harvey's mental health care treatment of Nolan or lack thereof was the cause of his PTSD, as is relevant and necessary to Nolan's medical malpractice claim.

III.     **Dr. Reff's Conditions of Confinement Opinions Will Not Assist the Trier of Fact**

In order to be admissible, an expert's opinions must assist the trier of fact to understand the evidence or to determine a fact in issue.  *See Myers v. Illinois Cent. R.R. Co.,* 629 F.3d 639, 644 (7th Cir. 2010).  As *Daubert* teaches, Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.'  This condition goes primarily to relevance."  *Id.* at 591.  In other words, "*Daubert* instructs that expert

testimony must be relevant and factually linked to the case in order to meet Rule 702's 'helpfulness' requirement." *United States v. Gallardo,* 497 F.3d 727, 733 (7th Cir. 2007); *see also Rodefer v. Hill's Pet Nutrition, Inc.,* No. IP 01-123-C H/K, 2003 WL 23096486, at *5 (S.D. Ind. 2003) (Hamilton, J.) ("Evidence is relevant under *Daubert* if it is "helpful" to the trier of fact and "fits" the issues in the case.").

In his deposition testimony and *Daubert* hearing testimony, Dr. Reff opined that Nolan's incarceration in solitary confinement caused or aggravated his psychological issues, including his PTSD, anxiety disorder, ADHD, and depression. Because this is a medical malpractice case and not a conditions of confinement case, these opinions are not helpful to the trier of fact because they are not relevant to any issues in this case. Accordingly, even if Dr. Reff had used an appropriate methodology to reach his causation opinions, the Court would strike his opinions where he opines that Nolan's solitary confinement caused or aggravated a variety of his mental health issues.

## CONCLUSION

For these reasons, the Court, in its discretion, grants in part and denies in part Defendant's *Daubert* motion to exclude the expert testimony of Dr. Robert Reff.

**Dated:** September 1, 2015

ENTERED

_____
**AMY J. ST EVE**
**United States District Court Judge**

23